Filed 2/11/14  P. v. Morell CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSICA RENEE MORELL,<br><br>    Defendant and Appellant. | A134052<br><br>(Sonoma County<br>Super. Ct. No. SCR581647) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD J. SCIUTTO,<br><br>    Defendant and Appellant. | A134567<br><br>(Sonoma County<br>Super. Ct. No. SCR581647) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CESAR CHAVEZ,<br><br>    Defendant and Appellant. | A134642<br><br>(Sonoma County<br>Super. Ct. No. SCR581647) |

In this consolidated appeal, defendants Jessica Renee Morell, Edward J. Sciutto, and Cesar Chavez seek reversal of convictions for crimes related to fighting that erupted outside of a private residence in Santa Rosa, California, where a birthday party was taking place.  One unarmed partygoer was stabbed to death and two others were stabbed

1

multiple times, all in their torsos. At trial, the prosecution, faced with limited direct evidence of the crimes, also relied on circumstantial evidence and the theory that defendants acted together as Norteño criminal street gang participants.

Sciutto and Chavez were each convicted of voluntary manslaughter and assault with a deadly weapon, among other things. Their appellate claims include that the trial court improperly instructed the jury on uncharged conspiracy based on their purported active criminal street gang participation and that there was no substantial evidence they committed voluntary manslaughter or engaged in such gang activity. Chavez also argues there was no evidence he committed assault with a deadly weapon.

Morell, Chavez's girlfriend, drove Sciutto and Chavez away from the scene after attempting to stop some of the fighting. She was convicted of, among other crimes, being an accessory after the fact to Chavez and Sciutto's crimes. She contends there was no substantial evidence that she knew at the time that any felonies had been committed and that the trial court wrongly allowed overly prejudicial gang evidence against her.

We conclude defendants' arguments are without merit and affirm the judgment, except that we stay a portion of Sciutto's sentence pursuant to Penal Code section 654.[1]

## BACKGROUND

In September 2011, the Sonoma County District Attorney filed a second amended information charging Chavez and Sciutto with the murder of Boonoi Douangmeechit (§ 187, subd. (a)) and assaults with deadly weapons of Mike Andee and Wilson Andee (§ 245, subd. (a)(1)). It was alleged that Chavez and Sciutto personally used dangerous and deadly weapons, knives, and personally inflicted great bodily injuries in committing the assaults, and that Sciutto had suffered two prior convictions. Morell was charged with helping Chavez and Sciutto avoid arrest and prosecution knowing they had committed felonies. Each charge was accompanied by a gang enhancement allegation (§ 186.22, subd. (b)). Each defendant was also charged with being an active participant in a criminal street gang (§ 186.22, subd. (a)).

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

A jury trial followed. We focus on the evidence relevant to defendants' arguments on appeal.

### The Birthday Party

Nou Andee decided to host a birthday party at her home on April 24, 2010 for her cousin, Semeye Douangmeechit (Semeye).[2] She told Semeye she wanted it to be for family and a few of Semeye's friends, to "have fun and no drama." Semeye invited her good friends Morell and Chavez, who were dating each other, and her former boyfriend, Roberto Herrera, the father of her son. Her relationship with Herrera had ended after the child's birth in 2008, and Herrera had not been a part of the child's life. Semeye and Herrera were trying to get along for the first time since their break-up.

Nou's residence had a front porch and garden area bounded by a low-lying wall, beyond which was the sidewalk and street. It was seven and a half to eight feet from the front porch railing to the low-lying wall, 15 feet from the front door to the sidewalk, and 27 feet from the front porch area to the street.

Semeye's brother, Boonoi, and Nou's brothers, Mike Andee and Wilson Andee, arrived at Nou's home during the day to help prepare for the party. Mike testified that Boonoi liked "to be in charge of us because he's the oldest" and was in charge of cooking the food, as always. Other party attendees who testified included Mike's girlfriend, Jeannette Nava; Wilson's girlfriend, Alejandra Aguilar; Andee's cousin Scott Phanchanh; Mike's friend, Michael Phipps; and Morell's co-worker, Crystal Silva. There was food and drink, including alcohol. Some witnesses said they drank heavily.

### Defendants' Arrival at the Birthday Party

Testimony indicated Morell picked up three other females, including Silva, and drove to the party in her burgundy-colored car. They soon left, picked up Chavez, Sciutto, and Herrera, and returned to the party.

Mike testified that, drunk, he greeted Herrera at the front door and grabbed the back of his head. Herrera, wearing a Giants jacket, took offense and they argued on the

---

[2] A number of witnesses share the same last name and, therefore, we refer to them by their first name for clarity's sake. We mean no disrespect by doing so.

3

front porch.  Phipps saw Mike tell three men arriving at the party that they had to leave, and argue with one, who said it was his "baby mama's birthday."

Wilson saw Sciutto, who he did not know, enter the house wearing a Saints jersey and go to the kitchen.  Aguilar saw three males and a girl named Jessica (Morell's first name) arrive; one male went to the kitchen and drank a shot without talking to anyone.  Nou saw Sciutto, who she did not know, enter the backyard alone, wearing what looked like a black Saints football jersey.  He introduced himself as "Eddie."

Semeye saw Morell enter the house alone upon her return.  She then helped Semeye clean up some vomit on a stairway.

### The Outbreak of Fighting

Mike said he argued some more with Herrera, then punched him because they "got too loud," and Herrera fell down.  Then, "everything went down."

Semeye said she heard loud voices and went outside, where she saw Mike arguing with Herrera, who was wearing a gray Giants jacket, on the house's walkway.  She and Morell pulled Herrera away, but Mike continued to argue, then punched at Herrera, "and that's when everything started happening."  Semeye tried to, but could not, separate them again.

Wilson said he saw Mike and Herrera arguing in the front yard as Semeye tried to stop them.  Herrera tried to go inside, fell on the ground, and Mike jumped on him.  Eight or nine people were running around.

### Testimony Regarding Chavez's Conduct During the Fighting

Mike saw a person with a goatee standing about five or six feet away from him as Mike argued with Herrera.  After Herrera went to the ground, Mike blacked out for a couple of seconds and next found himself in the middle of the street.  He heard people say, "he got stabbed, he got stabbed."  Mike turned around and saw "another guy" run by, about a foot away.  Concerned the guy was coming back to hit him again, Mike hit the guy, who stumbled, dropped something that Mike thought was a blade, though it was "pitch black" and Mike did not know what it was; the guy, who had a goatee, picked it up

4

and ran to Morell's car. Besides Mike's reference to a blade, none of the witnesses indicated they saw any weapons during the fighting.

Mike said he realized he was stabbed after the person he hit left for Morell's car. He had been stabbed two or three times. Though he could not recall who stabbed him the first time, he was "[p]retty sure" the person he hit stabbed him the second time. Asked if he recognized the person with the goatee in the courtroom, Mike indicated he could not recall and was trying to forget as much as he could and move on. He acknowledged he had said at a previous hearing that he thought it was Chavez, when it was closer in time to the incident. He did not recognize Chavez in the courtroom.

Mike recalled identifying photographs of Chavez to police soon after the incident and saying the person who ran by him had dropped what he thought was a blade with a black handle. He said he told the police the truth and remembered more at that time than he did at trial. However, he said, he also had previously testified that he identified Chavez to police because Chavez's picture popped into his head, since Chavez was standing near him during the incident. He did not actually see Chavez do anything or "really know" who stabbed him.

Wilson saw Chavez standing a foot or two from Herrera as Herrera argued with Mike in the front yard. Wilson was "pretty sure" Chavez wore a white T-shirt to the party, and recalled telling that to detectives. Wilson did not see Chavez fight with anyone.

Phanchanh, the Andees' cousin, was friends with Chavez when the incident occurred and identified him at trial. He did not see Chavez fighting that night, but saw him in the street after the fighting stopped. Semeye said she did not ever see Chavez during the fighting.

### Testimony Regarding Sciutto's Conduct During the Fighting

Wilson testified that he watched Mike and Herrera argue for a minute or two and then saw Sciutto in the street or on the sidewalk walking fast, approaching Mike. Sensing a threat, Wilson went to Sciutto, put him in a headlock, and punched him in the head three times. Wilson felt three punches on his back and sharp pain. He let go and

5

went back to the house, feeling blood and a new hole in his back; his girlfriend lifted his shirt and said he was bleeding. Semeye saw Wilson on the front porch, bleeding, and heard his girlfriend yell that he had been stabbed.

Phanchanh said he went to the front yard when he heard yelling and saw about half the people from the house were outside. Wilson was fighting with someone wearing a Saints jersey on the front porch or walkway, while Mike fought with Herrera on the sidewalk. At trial, Phanchanh could not identify with certainty the person who had fought with Wilson, but said Sciutto came close.

Nou said that, about five minutes after she went outside, she saw Mike and Sciutto, in his Saints jersey, fighting with each other, "punching mainly." She tried to stop them and fell on Mike near the sidewalk. He said he was hurt and "mentioned stabbed," which she ignored as she tried to stop the fight; she did not realize he had been stabbed until after defendants went away. Sciutto, now in the middle of the street, continued to argue with Mike. Nou did not see Mike fight with anyone else.

Nou acknowledged she had previously told detectives Mike could have been fighting with someone wearing a black shirt other than Sciutto, but said at trial that it was Sciutto. She also recalled telling detectives Mike fought with a couple of males, but could not recall if this was true.

### Testimony Regarding Morell's Conduct During the Fighting

As we have indicated, Semeye said she and Morell initially pulled Herrera away from Mike before Mike punched Herrera. Nou said she saw Semeye and Morell standing in front of Herrera in the street, about 22 feet from Mike and Sciutto, trying to hold Herrera back. Nou yelled to Semeye to stop the fight, and Semeye responded that she was trying.

### Additional Testimony Regarding the Fighting

Phipps said he went outside when he heard Nou scream and yell. He saw "people laying on the ground bleeding everywhere" and 20 or 30 people in the area. Mike, his best friend, was "fighting for his life" with someone Phipps could not identify. Phipps, after being punched by someone he did not see as he came down the porch steps, went to

6

Mike, pulled him away, and punched the other person three times, causing him to stumble backwards. Phipps then turned around and went to help Boonoi, who was on the front lawn. In helping Mike, Phipps was stabbed in the arm but could not say "exactly who stabbed" him because he was "pretty drunk," though "still functional" at the time. He saw Mike had wounds on the left side of his stomach.

Nava, Mike's girlfriend, said she went outside when she heard screaming. She saw about 10 people running around in the street. Wilson was on the porch, bleeding from his back, and Boonoi was lying on the grass. Mike was running in the street and fighting with a male Nava did not recognize. She pulled Mike away and the male ran to a car on the corner. Blood was "gushing out" of Mike. She acknowledged telling police she had heard the word "Norte" being said.

Aguilar, Wilson's girlfriend, said Nou told of a commotion outside, went out and came back in with blood all over her hands. Aguilar went outside and saw Boonoi in a garden area holding his left rib area, look at his hand and collapse, while Wilson scuffled with someone in the street as people tried to separate them. She pulled Wilson away, who said his back hurt and thought he had just been stabbed. She lifted his shirt and "blood just gush[ed] out."

A neighbor of Nou's, Marcus Freeman, testified that he heard a verbal confrontation outside on the night of the incident. From his balcony, he saw about six people fighting in the street, three on each side, as others tried to break them up or stood by and watched.

### Testimony Regarding Defendants' Departure

Nou saw Herrera, Sciutto, and two or three other people leave in a car parked on a diagonal from her house. Mike saw a group of five to seven people, including Herrera, run to Morell's car. Phanchanh saw Chavez and Herrera walk to a burgundy car down the street. Semeye, who could only remember standing in the middle of the street after the fighting began, recalled that Morell hugged her goodbye and left.

7

Freeman said that, after he watched the fighting for a couple of minutes, six to eight people got into a red car parked down the street and left. He heard someone yell that "they had a knife."

Another neighbor, Oscar Orellana, testified that he heard a fight outside on the night of the incident. From an upstairs window, he saw a burgundy car parked near his house. A "couple of girls and guys [were] just yelling" and two girls, maybe more, were pushing the guys back. A guy in front of the car, wearing a white shirt, yelled, "shaoo," which Orellana recalled hearing Norteños say in high school. One girl said, "let's get out of here before the police come." About two guys got into the back seat of the car. The girls "probably all got in the car" too and one drove the car away.

Aguilar said she saw people running to a burgundy car and heard one yell, "Norte 14." Questioned repeatedly at trial about the matter, she said she did not tell police about the yell because she did not remember it at the time, could not recall if she told police because she was interviewed at 3:00 a.m. or 4:00 a.m. and was sleepy, and did not think she told police, nor know why she did not.

Silva saw people "bunched up" outside, but did not see any fighting; she found Morell, and went with her and the other girls they came with to Morell's car. Chavez was already sitting in the front passenger side. Morell got in the driver's seat, Silva sat behind Chavez, and Herrera and Sciutto got in the back seat a short time later. Silva did not hear anyone yell any gang slogans or see anyone wear red that night. No one talked in the car, other than to say "that was crazy." She did not know anyone had been stabbed, no one referred to such a thing, and she did not see any weapons, blood, or signs of anyone being injured.

Morell dropped off Sciutto and Herrera, then drove to her house, where Silva, Chavez, and Morell watched television while Silva waited to be picked up. They did not talk about the incident, and Morell did not notice that Chavez had any scratching or bruising, or was upset.

8

### *Additional Testimony Regarding Boonoi*

Semeye testified that Boonoi came outside and stood by the wall between the front yard and the sidewalk while Mike and Herrera argued. After Morell hugged Semeye goodbye, she saw Boonoi standing by the walkway near some bushes, holding himself. She ran to him, lifted his shirt, and saw blood everywhere.

Nou, after realizing Mike had been stabbed, saw Boonoi walking slowly, "drenched in blood." Wilson saw Boonoi lying on the front lawn with Phanchanh as he went back to the house; he did not see Boonoi fight with anyone. Phanchanh saw Boonoi walk towards the house from the front sidewalk and collapse, wounded, as Chavez and Herrera went to the car.

### *Testimony Regarding the Investigation*

Santa Rosa Police Detectives Tom Peirsol, Ryan Corcoran, and Mark Mahre testified about witnesses' statements to them after the incident. Piersol said Mike told him in the hospital shortly after the incident that he had been stabbed twice, the second time by a Hispanic male with a mustache, goatee, and bald head who he identified as Chavez from photographic lineups. Mike also said he saw a black-handled folding knife.

Corcoran said he interviewed Phanchanh and Nava, among others, on April 25, 2010. Phanchanh said Chavez was involved in the fight with his cousins and identified Morell, Herrera, and someone who looked like Sciutto as party attendees. She said she heard the word "Norte" at the fight.

Mahre said he interviewed Wilson on April 25, 2010. Wilson, examining photo lineups, identified Herrera as present at the incident, and said photographs of Chavez and Sciutto looked like people who were present also. He did not say Chavez had been fighting.

A doctor who performed an autopsy of Boonoi's body testified it had three stab wounds from a single edge knife, all from the front and oriented similarly, suggesting they occurred at the same time. One punctured the left lung and heart, causing death within minutes, another penetrated the chest wall, and the third went through the chest

9

wall into the side of the left lung. The body had apparent defensive wounds on the back of the hands.

A surgeon who treated Wilson and Mike testified that Wilson had three small stab wounds in his back, one of which penetrated the lining of his chest wall and two of which penetrated muscle. Mike had two stab wounds.

A Santa Rosa police evidence technician testified that blood drops were found on Morell's car, a bloodied knife clip was found on the car's inside floorboard. A Department of Justice criminalist testified that blood stains from the recovered knife clip, as well as from the interior of Morell's car and the roadway near where it had been parked during the fighting, matched Sciutto's DNA. Knives were also found in the car; apparently these were not used in the incident because Piersol testified the knives used were never located.

Testimony indicated Boonoi's, Wilson's, and Mike's blood alcohol levels were 0.10, 0.14, and 0.15 respectively within hours after the incident.

### Testimony of Gang Expert John Cregan

Santa Rosa Police Detective John Cregan testified as an expert in criminal street gangs. A 12-year law enforcement veteran, he was assigned to the department's gang crimes team, which investigated all gang-related crime that occurred in Santa Rosa. He had attended 20 classes on criminal street gangs, been involved personally in hundreds of gang investigations, and done nothing but gang crimes for the previous three years, taking calls from patrol officers, reviewing police reports, and assisting in investigations. His testimony included a review of a PowerPoint slide presentation he had prepared.

Cregan identified the Norteño gang as a "criminal street gang," defined as an association of three or more persons having as one of its primary activities the commission of one or more of the criminal acts stated in section 186, subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engaged in a pattern of criminal gang activity. It was one of the county's primary gangs, with hundreds of active gang participants. Cregan explained

10

that he focused on "active gang participants" based on the relevant legal requirements, rather than "gang members," which he considered a social term used by gangs.

According to Cregan, the Nuestra Familia, a prison street gang, and its "sibling gang," the Northern Structure, were the two Norteño gangs that led over Sonoma County subsets such as "NX4" through "a formal level chain of command." Javier Zubiate, once a "street level foot soldier" for NX4 in Santa Rosa, controlled gang activities in Northern California, including in Santa Rosa, via the Nuestra Familia from Pelican Bay Prison.

Cregan opined that the Norteños, including its NX4 subset, was a criminal street gang, based on his investigation of hundreds of Norteño gang cases. The gang was "an ongoing organization" and, Cregan said, "every single day, even here specifically in the city of Santa Rosa, I deal with reports of crimes that are committed by the Norteño criminal street gang." Apparently referring to his PowerPoint presentation, Cregan said the gang had engaged in patterns of criminal activity identified in section 245, including assault with a deadly weapon, which was "a crime that is very, very prevalent among gang members, particularly among Norteños" and "a very, very common occurrence in Sonoma County and throughout the state." These patterns also included such "common" occurrences as robbery, murder, shooting at an inhabited dwelling with a firearm, shooting from a vehicle, witness intimidation, kidnapping, mayhem, criminal threats, prohibited possession of a firearm, and carrying concealed firearms. Cregan indicated, in cross-examination, that the offenses enumerated in his PowerPoint presentation regarding these patterns were primary activities of the Norteños. He identified three individuals who were active Norteño gang participants when they were convicted of assault with a deadly weapon.

Cregan said "respect" was "the foundation" upon which gangs were built, "the most important aspect of a . . . gang member's life and the gang itself," and the most important reason why many gang assaults took place. According to Cregan, "[i]f you were disrespected as a gang member, especially in public and in front of other gang participants, it's extremely important that you immediately show . . . that you can dominate over anyone else by going in there, whether it be viciously attacking that

11

person, whether it be stabbing that person, whether it be shooting that person, you're showing to that and certainly to everyone else who witnessed that violent assault that you were the dominant person, that you were the Norteño gang member, you have dominance over them. You are to be feared and respected." Furthermore, Cregan said, respect "can change dramatically based on one incident. . . . [I]f you're at a party . . . and some type of confrontation takes place and there's a group of gang participants that are there, and you stand idly by and you let your fellow gang members get in a fight," Cregan testified, "your respect will be dramatically decreased by you standing by and not getting involved in that incident." There were repercussions for gang members who did not "step up to the plate," which could include expulsion from the gang.

Cregan said there was no set protocol for becoming a Norteño gang member, but there were opportunities, including when a fight occurred, when members watched a person's behavior "to see if you step up to the plate . . . , and the more violence that you portray during that fight[,] the bigger actions that you take, the greater respect that you are going to gain out of that . . . ."

Also, Cregan testified, female gang members played a "critical support role." They helped transport letters back and forth from prison, which was a way that people like Zubiate "sen[t] back orders to the streets of Santa Rosa." In fight situations, they often helped male gang members flee the scene to avoid arrest.

According to Cregan, officers indentified individuals as gang members based on the totality of circumstances, using criteria from the Sonoma County Law Enforcement Chief's Association. These included a person's admissions to law enforcement, gang tattoos, gang attire, arrests with known gang members or for offenses consistent with usual gang activity, identification as a gang member by an informant, affiliation with known gang members, the public display of gang-related hand signs, including in photographs posted on web sites such as Myspace, and the frequenting of gang areas.

As for specific gang identifiers, Cregan said Norteño gang symbols included the number "14," "XIV," the "huelga bird," and a northern star. He identified a variety of red clothing and tattoos as associated with Norteños, and said a person with the tattoo

12

"NX4" was a part of that gang. He said Norteños shouted gang challenges during assaults, including "Norte," which identified the person shouting as a Norteño, and "shaoo,"[3] "a Norteño gang war cry" and a cry for help to other gang members. Cregan detailed numerous gang-related instances in which the word "shaoo" was used.

Cregan said he was aware of each defendant through his work as a gang investigator and on the present case. Sciutto had gang tattoos, including a huelga bird on his stomach, a roman numeral "X" on his right biceps, and a "4" on his left arm. His Myspace account displayed photographs indicating his Norteño and NX4 gang participation and the word "shaoo." Past relevant events included that in 2009, an officer saw him destroy several Norteño written communications, and a search of his residence uncovered Norteño-specific clothing and drawings; in 2005, a court ordered him to register as a gang participant; in 2003, he acknowledged to California Youth Authority staff that he was an NX4 gang participant; and in 2002, a police officer contacted Sciutto in the company of two known members of NX4, each of the three "armed with some type of weapon."

Chavez had various gang-related tattoos, including an "N," "X," and "4" superimposed on each other. In an April 2010 search of his and Morell's residence, gang writings and drawings, and a digital camera that contained gang-related photographs, were found, and Cregan had reviewed other photographs in which Chavez flashed gang signs and was in the company of gang participants. In 2008, Chavez admitted he was a Norteño gang participant to a police officer and a search of his residence uncovered NX4-related writings and gang clothing; in 2007, Chavez told a police officer he associated with Norteño gang members; in each of 2006 and 2007, Chavez was twice found in the company of known Norteño gang participants; and in 2006, Chavez told Cregan he was a Norteño gang associate.

Morell had two northern stars tattooed on the back of each shoulder. At the time of the incident, gang-related images were displayed on her Myspace account, including

---

[3] The spelling of this term is slightly different at times in the record and briefs. We refer to it as "shaoo" throughout for consistency's sake.

13

one with "NX4" and another with "Gangster Bitch" written on it, photographs adorned with red northern stars, and photographs of her with Chavez and Herrera; the word "shaoo" was also displayed. Digital photographs found on a camera in her residence showed Morell flashing gang signs, including a "1" and a "4," and wearing red attire. In 2008, police found photographs on a digital camera taken from Morell's vehicle showing her with Norteño gang participants, including Herrera, flashing gang hand signs, and in 2007, she was at a party with other Norteños when one of them was shot.

Cregan opined that Sciutto, Chavez, and Morell were active Norteño gang participants as of the day of the incident. Cregan opined Herrera was too, based on Cregan's previous contacts and investigations.

The prosecutor asked Cregan to consider a hypothetical that, at a party attended by three male active Norteño gang participants, a fistfight occurs over some perceived disrespect, four unarmed partygoers are stabbed by one or more of the Norteños, witnesses hear the words " 'Norte' " and " 'shaoo' " yelled, females push the Norteños back, someone is heard to say, " '[y]ou need to leave before the police come,' " and the females and males flee in a vehicle driven by a female active Norteño gang participant. Cregan opined that the presence of active gang participants, the shouting of Norteño gang challenges, and the gang participants' fleeing together indicated this conduct was "clearly" gang related.

The parties stipulated that, other than defendants and Herrera, Cregan found the attendees of Semeye's birthday party were not active gang participants.

### Jury Verdict and Sentencing

Defendants introduced very little evidence of their own. As we will discuss, the prosecutor argued to the jury that, in considering whether or not Sciutto and Chavez were guilty as charged, it could consider alternative theories of liability, namely whether they had acted as coconspirators or as aiders and abettors of each other.

The jury found Chavez and Sciutto not guilty of murder, but guilty of voluntary manslaughter. Chavez was found guilty of assault with a deadly weapon of Mike and not guilty of assault with a deadly weapon of Wilson. Sciutto was found guilty of assault

14

with a deadly weapon of Wilson, and guilty of simple assault of Mike. Morell was found guilty as an accessory after the fact. The jury found all gang enhancement allegations to be true. All three defendants were found guilty of violating section 186.22, subdivision (a), as active participants in a criminal street gang. Sciutto admitted to suffering two prison priors.

Chavez and Sciutto received prison sentences of 15 years and 20 years respectively. Morell was placed on probation for four years.

Each defendant filed a timely notice of appeal. We consolidated their appeals for the purposes of briefing, oral argument, and decision. Chavez and Sciutto have joined in several of each other's appellate arguments.[4]

## DISCUSSION

### I. *The Court's Jury Instruction Regarding Uncharged Conspiracy*

The trial court instructed the jury on uncharged conspiracy because the prosecution argued Chavez and Sciutto, active Norteño criminal gang participants, acted together as coconspirators (as well as aiders and abettors of each other, as we will discuss). Sciutto and Chavez argue the trial court erred in giving this instruction for numerous reasons, none of which is persuasive.

### A. *The Relevant Proceedings Below*

The trial court instructed the jury regarding conspiracy and vicarious liability[5] pursuant to CALCRIM Nos. 416[6] and 417,[7] correctly stating the law regarding

---

[4] Chavez joins in Sciutto's arguments that the court erred by instructing the jury on uncharged conspiracy and allowing in evidence of Sciutto's 2002 possession of a weapon, and that there was no substantial evidence of voluntary manslaughter, criminal street gangs, or aiding and abetting any felonious gang conduct. Chavez also joins in a nonexistent section "XIII." Sciutto joins in Chavez's arguments that there was no substantial evidence of voluntary manslaughter, the court should not have instructed the jury on uncharged conspiracy nor denied Chavez's motion to bifurcate, the jury's gang enhancement finding should be reversed as inconsistent with Chavez's voluntary manslaughter conviction, and the active gang participation statute was unconstitutionally vague and overbroad.

15

**5** Chavez contends the court's uncharged conspiracy instructions were given "over objection." However, neither he nor Sciutto identifies such objections in the record, other than to refer to their posttrial motions for a new trial.

**6** The court's instruction pursuant to CALCRIM No. 416 included that "[t]he People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of a conspiracy. [¶] To prove that a defendant was a member of a conspiracy in this case the People must prove that: [¶] 1. The defendant intended to agree and did agree with the other defendant or Roberto Herrera to commit [section] 187 and [section] 245[, subdivision] (a)(1); [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit [section] 187 and [section 245[, subdivision] (a)(1); [¶] 3. One of the defendants, or Roberto Herrera, or all of them committed at least one of the following overt acts to accomplish [section] 187 and [section] 245[, subdivision] (a)(1): Defendants arrived at the party together, defendants engaged in an altercation at the party together, defendants stabbed four individuals and defendants fled the scene together. [¶] AND [¶] 4. At least one of these overt acts was committed in California."

The court's instruction also included that "[t]he People must prove that the members of the alleged conspiracy had an agreement and intent to commit [section] 187 and/or [section] 245[, subdivision ](a)(1). The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime. [¶] An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself. [¶] You must all agree that at least one overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts."

**7** The court's instruction pursuant to CALCRIM No. 417 included that "[a] member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. [¶] A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

16

conspiracy. In closing argument, the prosecutor, along with asserting that Chavez and Sciutto were guilty of murder and assault as aiders and abettors, repeatedly referred to the conspiracy theory of liability. This theory was based significantly on Cregan's testimony about defendants' active Norteño gang participation and the Norteño code of conduct. Chavez quotes several closing argument statements by the prosecutor, including:

"In order to prove an uncharged conspiracy theory of liability, we have to show they conspired to commit one of the crimes. Again we don't have to show a formal agreement, we don't have to show they huddled together and discussed this before it went down. It can happen in a second. And in the code of conduct for gang members it is not unusual that when violence erupts you are going to have to act. And that you heard through Detective Cregan."

"And I want to put in your mind to think about what facts we can infer that there was a conspiracy. The facts that [Chavez and Sciutto] were both active Norteño gang participants at the time of [the] incident . . . . That's one fact you can consider. Now you heard discussion from Detective Cregan about active gang participants in the Norteño criminal street gang, what is their code of conduct? What do they do? What is expected of gang members? How are they supposed to act?. . . Detective Cregan told you basically violence equals respect among the gang. There is a certain code of conduct related to backing your homies up, backing your fellow gang members up no matter what. You are down for whatever should happen. If one of your gang member homies is involved in an incident, you are expected to be backed up."

"The law contemplates that you can find them guilty of murder of Boonoi even if we do not know who actually inflicted the fatal wound. If you apply those theories of liability, an act of one is an act of all."

"They are Norteños. Walks like a duck, talks like a duck, looks like a duck, it is a duck. In this instance these defendants are gang members. They are active participants in the criminal street gang. You heard that through Detective Cregan."

17

**B.** *Uncharged Conspiracy as an Alternative Theory of Criminal Liability*

Sciutto first argues that the prosecutor's theory of uncharged gang conspiracy is not a legally authorized theory of criminal liability. Therefore, the court's instructions deprived him of due process and a fair trial, and the judgment must be reversed. We disagree.

We consider such issues de novo. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) We have already stated the law of conspiracy from the trial court's instructions pursuant to CALCRIM Nos. 416 and 417. We further note that it "need not be shown that the parties entered into a definite agreement, but it is sufficient if they positively or tacitly come to a mutual understanding to accomplish the act and unlawful design. The evidence may cover many transactions, extend over a long period of time, and show acts which occurred some time before the alleged formation of the conspiracy, as long as the facts shown have some bearing or some tendency to prove the ultimate facts in issue." (*People v. Calhoun* (1958) 50 Cal.2d 137, 144.) Also, as the trial court instructed, a conspirator is liable not only for the intended act of any member of the conspiracy done to further the conspiracy, but also for an act that is the natural and probable consequence of the conspiracy. (*People v. Prieto* (2003) 30 Cal.4th 226, 249.)

"It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations].' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 788-789 (*Belmontes*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Sciutto presents the somewhat convoluted arguments that (1) all criminal laws must be statutorily authorized, (2) uncharged conspiracy is not a statutorily authorized theory of liability under sections 31 (regarding who are principals in crimes), 971 (abrogating the distinctions between principals and accessories before the fact), or 182

18

(regarding what acts constitute a criminal conspiracy) because a coconspirator, by agreeing to a conspiracy, is not a "principal" under these statutes and, therefore, "evidence that a defendant agreed to commit a target offense, is not without more, a legally valid theory of criminal liability," (3) the *Belmontes* court did not address this argument and relied on cases inapposite to its own holding, and (4) section 31 should not be construed to contemplate a coconspirator as a principal.

These arguments lack merit for three reasons. First, contrary to Sciutto's assertion, our Supreme Court has taken on such a statutory argument. In *People v. Valdez* (2012) 55 Cal.4th 82, a case cited by the People, the court stated, "Defendant now asserts the trial court erred in allowing the prosecution to proceed on an uncharged conspiracy because, under the statutory definition of principal (§ 31), 'participation in a conspiracy alone is not an authorized basis for finding a person guilty of any offense other than conspiracy, a crime also defined by statute. (§ 182.)'. . . [¶] Defendant's arguments are unpersuasive. Our decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.' " (*Valdez*, at pp. 149-150.) Therefore, the court was not precluded from giving conspiracy instructions to the jury. (*Id*. at p. 150.)

Second, the California Supreme Court has long recognized the validity of a coconspirator theory of principal liability, as seen by *People v. Kauffman* (1907) 152 Cal. 331. This case law, which includes *Belmontes* and *Valdez*, makes clear that the People may assert, and the jury may be instructed regarding, an uncharged conspiracy theory of liability.

Third, Sciutto's arguments regarding the purportedly poorly reasoned analysis presented in *Belmontes*, such as its reliance on supposedly inapposite cases, is in effect an invitation to this court to ignore Supreme Court authority. This, we cannot do. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

**C. *Use of Gang Evidence to Show Conspiracy***

Sciutto next argues the prosecutor improperly "relied on an uncharged implied conspiracy theory based entirely on her gang 'expert's' opinion that Norteños had an

'understanding' and 'expectations' of each other."  According to Sciutto, "[t]his theory is unconstitutional and legally insufficient because it effectively makes every single Norteño in Sonoma County, and arguably anywhere in the world, a coconspirator in Boonoi's killing.  This overbroad theory results in the criminalization of association and gang status, contrary to the law of conspiracy and California's criminal street gang statute."  Sciutto points out that "mere membership in or association with members of a criminal street gang defined under California's criminal street gang statute ([]§ 186.22) is . . . not culpable conduct," citing *People v. Gardeley* (1996) 14 Cal.4th 605, 623.  He also briefly argues that the instructions deprived him of due process by absolving the jury from the duty to evaluate his individual specific intent and knowledge when determining whether he entered into an agreement with either Chavez or Herrera to commit either murder or assault with a deadly weapon.

Chavez similarly argues that there was no evidence to support an uncharged gang conspiracy theory and that the use of gang evidence in support of such a theory denied him his federal due process right to a fair determination of guilt on this theory.  He also argues the gang evidence was not probative as to who committed, or aided and abetted in the commission of, the crimes charged against him.  Therefore, its use permitted the jury to find him guilty of voluntary manslaughter and assault without considering whether the People had proved beyond a reasonable doubt that he was a principal or an aider or abettor to these crimes.

Sciutto's and Chavez's "overbroad" and "due process" arguments are unpersuasive, given the theories and evidence presented at trial.  The prosecution's uncharged conspiracy theory was based not only on Cregan's testimony about defendants' ongoing commitment, as active gang participants, to a Norteño code of conduct, but also on defendants' particular conduct on the night of the incident.  The prosecutor argued that, "[i]n order to prove an uncharged conspiracy theory of liability, we have to show they conspired to commit *one of the crimes*.  Again we don't have to show a formal agreement, we don't have to show they huddled together and discussed this before it went down.  *It can happen in a second*."  (Italics added.)  In effect, she

20

contended that Sciutto and Chavez, having arrived at the party with fellow active gang participants Herrera and Morell, responded to Mike punching Herrera and, informed by their Norteño code of conduct, did so with greater violence, i.e., engaging in assaults with deadly weapons.  The court's instruction similarly focused on Sciutto's and Chavez's conduct on the night of the incident and the need for the jury to determine that any conspiratorial agreement was to commit one of the charged crimes.  Both the prosecutor's theory and the court's instruction were consistent with the law of conspiracy, which, as we have indicated, can be based on a *tacit* agreement between coconspirators to engage in criminal acts.  (*People v. Calhoun*, *supra*, 50 Cal.2d at p. 144; *People v. Lauria* (1967) 251 Cal.App.2d 471, 475.)

As for the evidence, contrary to Chavez's contentions, it did not show that his and Sciutto's involvement in the fighting merely "reflected the fact that Sciutto and Herrera were accosted by some partygoers."  Along with Cregan's testimony of the Norteño code of conduct and defendants' active participation in the gang, substantial evidence indicated that defendants intended to, and did, act together on this code at the party.  These actions included their arrival together with other active Norteño gang participants, armed with knives; the direct evidence of the stabbing of unarmed partygoers in their torsos by Sciutto (of Wilson) and Chavez (of Mike), during the fighting that broke out after Mike disrespected Herrera; shouts of Norteño gang challenges that were heard from their departing group; and defendants' fleeing the scene together before the police arrived.  A reasonable juror could infer from this substantial evidence that, while defendants may not have arrived at the party as active gang participants prepared together to *initiate* a fight, they were prepared together to *respond* to any altercation with deadly force.

Chavez's further contentions in effect ask us to reweigh evidence.  For example, he points out that Semeye invited Morell and Herrera, and shared a child with Herrera from their previous relationship, that there was no evidence that Chavez, Sciutto, and Herrera went to the party to start a fight or assault anyone, and that there was no rival gang involved.  This evidence is of little, if any, significance in light of the substantial evidence we have summarized.

21

The law relied on by Sciutto and Chavez is unpersuasive in light of the theory argued and the evidence presented by the People. Sciutto cites *Krulewitch v. United States* (1949) 336 U.S. 440 to argue that the People's uncharged conspiracy theory "cast an indefinite net over the community" in violation of his due process rights. However *Krulewitch* did not involve a circumstance in which the prosecution relied on the tacit agreement of coconspirators to engage in specific criminal acts at the time of the incident. Instead, the court reviewed whether or not the hearsay exception for statements between coconspirators should apply to statements between *former* coconspirators over a month and a half after the conspiratorial acts had ended, matters which are not implicated in the present case.

Chavez principally relies on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*)), in which the appellate court held that the trial court had improperly allowed expert testimony about gangs to be presented at a murder trial when the subject incident did not involve evidence of any gang activity. As we will discuss, *Albarran* involved inapposite facts. Unlike in *Albarran*, here, there *was* evidence of gang activity during the incident, such as the Norteño gang challenges that were shouted from the departing group. (See *id*. at p. 227 [noting that the shooters did not announce any gang presence or purpose before, during, or after the shooting].)

Chavez also contends it was "significant" that Cregan testified defendants were "active participants" in a criminal street gang, rather than "members." However, Cregan stated that he focused on "active gang participants" based on the legal requirements, rather than "gang members," which he considered a social term used by gangs. Chavez's distinction is one without difference for the purposes of meeting the legal standards involved, and nothing he argues indicates otherwise.

Sciutto also briefly argues that "instructing the jury on the prosecutor's uncharged conspiracy theory grounded on [Sciutto's] Norteño status . . . infringed on his First Amendment right to associate lawfully with others; others who may or may not have had criminal intent." Sciutto does not support this conclusory argument with any legal authority. Therefore, we disregard it. (*People v. Stanley* (1995) 10 Cal.4th 764, 793

22

(*Stanley*) [a court may treat as waived, and disregard, a point not supported by legal argument with citation to authorities].)  In any event, again, the prosecutor's theory was based on defendants' conduct, not just their gang participation.  Unlawful conduct is not protected by the First Amendment.  (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1110-1112.)  In light of the conclusory nature of Sciutto's brief argument, we do not address the People's waiver argument.

In short, the uncharged conspiracy theory, as the prosecution argued it and the court instructed, was specific to defendants' agreements and their conduct regarding this particular incident, and there was substantial evidence to support this theory.  Sciutto's and Chavez's various arguments are without merit.

## D.  *Argumentative Instruction Claim*

Sciutto, and Chavez briefly in a footnote, argue the first sentence of CALCRIM No. 416 is argumentative and deprived them of due process and a fair trial.  It reads, "The People have presented evidence of a conspiracy."  The People argue the issue, while lacking merit, has been waived for failure to object, to which Sciutto responds no objection is necessary pursuant to section 1259.

"Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection."  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)  Section 1259 provides in relevant part that we "*may* . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."  (§ 1259, italics added.)  "It is a well-settled principle of statutory construction that the word 'may' is ordinarily construed as permissive."  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443.)

Sciutto and Chavez do not give us a good reason to consider their "argumentative" claims.  Chavez does not address the waiver issue; Sciutto cites with little, if any, explanation to section 1259 and a case in which the Supreme Court considered the alleged error despite the lack of objection (*People v. Slaughter* (2002) 27 Cal.4th 1187,

23

1199-1201). He also contends that here, "defense counsel objected to the instruction," but does not provide a citation to the record showing this.

Generally, we may, and do, consider factual or legal claims that are unsupported by citations to the record or legal authority as waived. (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379 [regarding unsupported factual assertions]; (*Stanley*, *supra*, 10 Cal.4th at p. 793 [regarding unsupported legal arguments].) Given that defendants had the opportunity to object before the instruction was given and the paucity of their appellate arguments on the matter, we find waiver.

Sciutto's and Chavez's argumentative claims also lack merit. A very similar argument about the same sentence of CALCRIM No. 416—that it "impermissibly directed the jury to find that a conspiracy existed" —was rejected in *People v. Williams* (2008) 161 Cal.App.4th 705, 709. The *Williams* court, upon reviewing the entire instruction, concluded that, "rather than directing the jury to find that a conspiracy existed, CALCRIM No. 416 instructs the jury to decide whether the prosecution proved the elements of a conspiracy[,] as well as whether the defendant was a member of the conspiracy." (*Id*. at p. 710.) We reach the same conclusion here.

## E. *Chavez's Other Due Process Arguments*

Chavez makes two other due process arguments regarding the court's uncharged conspiracy instruction, both of which are unpersuasive.

First, Chavez argues the court violated his state and federal due process rights because its instructions did not indicate the People had to prove all elements of the uncharged conspiracy beyond a reasonable doubt. However, while CALCRIM Nos. 416 and 417 do not refer to a burden of proof, " ' "[i]n determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112; see also *People v. Jourdain* (1980) 111 Cal.App.3d 396, 404 [court's instruction regarding conspiratorial statements was proper despite no reference to a burden of proof because the court instructed the jury

24

elsewhere that it could not find appellant guilty unless proven beyond a reasonable doubt].) We conclude Chavez's argument lacks merit in light of the court's instruction to the jury pursuant to CALCRIM No. 220 that "[a] defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. *Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt . . . .*" (Italics added.) Chavez argues we should not rely on this instruction because it purportedly relates to charged offenses only, but there is no such limitation in it.[8]

Second, Chavez argues that the trial court's giving of the uncharged conspiracy instructions denied him notice of the charges against him in violation of due process of law. He correctly points out that the Sixth Amendment of the federal Constitution requires that an accused be given sufficient notice of the charges against him so that he or she may prepare a defense, as indicated in *Russell v. United States* (1962) 369 U.S. 749, 763 and *Hamling v. United States* (1974) 418 U.S. 87, 117. However, he was not charged with conspiracy; instead, the People presented this as one of their theories of liability for the charges brought, of which Chavez received notice, including the charge that defendants committed offenses for the benefit of a street gang. As indicated by our independent research, "an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely." (*People v. Diaz* (1992) 3 Cal.4th 495, 557.)

Also, although not pointed out by the People, the prosecution's proposed jury instructions, filed before trial on August 26, 2011, included requests that the jury be instructed pursuant to CALCRIM Nos. 416 and 417. Therefore, defendants had sufficient notice of the prosecution's intent to pursue this alternative theory of liability.

---

[8] Chavez also argues briefly in a footnote that the court further lowered the prosecution's burden of proof by instructing the jury pursuant to CALCRIM No. 400 that it "need not unanimously agree, nor individually determine, whether a defendant is an aider or abettor or a direct perpetrator, so long as each juror is convinced beyond a reasonable doubt of guilt." Chavez does not accompany this argument with any law or reasoning, and gives us no reason to find error.

(See *People v. Crawford* (1990) 224 Cal.App.3d 1, 8-9 [discussion at the initial pretrial instructional conference gave the defense adequate notice under the Sixth Amendment of the prosecution's felony-murder theory of liability].)

In light of our conclusion, we do not address the People's conclusory waiver argument. We also do not address claims of the prejudice caused by the uncharged conspiracy instructions, since we have found the court did not err.

## II. *Defendants' Insufficient Evidence Claims*

Morell, Scuitto, and Chavez argue there was insufficient evidence to support certain convictions. We disagree.

In considering an insufficiency of evidence claim, we "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) For a verdict that rests "to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.) We now review each defendant's claims.

## A. *Evidence of Chavez's Assault With a Deadly Weapon of Mike*

Chavez argues there was insufficient evidence to support his conviction for assault with a deadly weapon of Mike. We conclude there was direct evidence sufficient to support this conviction.

In order for Chavez to be found guilty, as a principal, the jury needed to find, as the court instructed, that he willfully and knowingly did an act with a deadly weapon that by its nature would directly and probably result in the application of force on Mike's person. (CALCRIM No. 875.)

26

According to Chavez, Mike's testimony, the only evidence that places Chavez with a knife in his hand and in a position to stab Mike, was insufficient. Citing to evidence of Mike's heavy drinking at the party and his 0.15 blood alcohol level, Chavez contends "Mike was so drunk, he did not know when he was stabbed, let alone by whom." He points out Mike testified he could not tell what Chavez dropped on the ground after Mike punched him and only told police that Chavez stabbed him because Chavez's picture popped into his head after his blackout. Thus, Mike's testimony is "sheer speculation, imagination, and guesswork" and "no reasonable inferences can possibly be drawn from it."

Chavez's argument ignores important testimony. Regardless of his drinking, Mike said he recalled being a foot from Chavez when he heard people saying he had been stabbed. Although Mike said he did not know who stabbed him, he also said he recalled the second time he was stabbed and was "pretty sure" Chavez did it. Pressed on the issue, he waffled, but his answers could reasonably be construed as suggesting he did so because he wanted to, as he put it, "move on." Most importantly, Detective Piersol said that Mike identified Chavez shortly after the incident as the person who stabbed him the second time. And Mike acknowledged he told the truth at that time and remembered more than at trial. A juror could reasonably conclude from Mike's and Piersol's testimony that Mike recalled Chavez stabbing him, but was hesitant to say so at trial. Thus, a reasonable juror could conclude beyond a reasonable doubt that Chavez was guilty of assault with a deadly weapon of Mike.

**B. *Evidence of Voluntary Manslaughter***

Chavez and Sciutto argue their voluntary manslaughter convictions must be reversed because they were not supported by sufficient evidence. This too is incorrect.

**1. *Relevant Legal Standards***

Voluntary manslaughter is defined as "the unlawful killing of a human being without malice" and "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

This "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . ." (*People v. Berry* (1976) 18 Cal.3d 509, 514.)

The prosecutor argued Chavez and Sciutto were guilty of voluntary manslaughter as uncharged conspirators and aiders and abettors of each other. We have already summarized the law of conspiracy from the trial court's jury instructions in footnotes 6 and 7, *ante*, including that a conspirator may be responsible for acts that are the natural and probable consequence of the conspiracy. (*People v. Prieto*, *supra*, 30 Cal.4th at p. 249.)

A person may be found guilty as a "principal" in a crime if he or she aids and abets in its commission. (§ 31.) A defendant is an aider and abettor if he or she " 'acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) "Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted.) Also, "under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*McCoy*, at p. 1117.)

Generally, the determination of whether a particular criminal act is a natural and probable consequence of another criminal act "is a factual question to be resolved by the jury . . . . [T]he issue . . . depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.) "But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ." ' " (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

28

## 2. *The Evidence of Voluntary Manslaughter*

As Chavez and Sciutto assert, there was no direct evidence from which Boonoi's stabber could be identified. Nonetheless, we conclude there was substantial circumstantial evidence from which a reasonable juror could conclude beyond a reasonable doubt that Chavez and Sciutto were guilty of the voluntary manslaughter of Boonoi, whether as coconspirators or aiders and abettors, because it was the natural and probable consequence of their intended actions to respond to any attack on them or fellow gang participants, such as Herrera, with greater violence, including with the use of knives.

Our conclusion is based significantly on our Supreme Court's analysis in *Medina*, *supra*, 46 Cal.4th 913. Defendants Marron and Vallejo, members of a violent street gang, were convicted of the first degree murder of a member of another gang as aiders and abettors of a third member of their own gang, defendant Medina. (*Id*. at pp. 917, 919.) The three had asked the victim where he was from and, after he stated his gang membership, had engaged in a fistfight with him. (*Id*. at pp. 916, 918.) After the fistfight had ended, Medina had shot and killed the victim as he drove away from the scene. (*Ibid*.) A gang expert testified that a statement of gang membership like that by the victim would have been viewed as disrespectful, resulting in a fight; a gang member asking where someone was from could have been armed and probably would be prepared to use violence ranging from a fistfight to homicide; it was important for a gang to be respected and feared by other gangs; death was sometimes an "option" exercised by gang members for respect; and a lot of gang members occupied their "turfs" with guns. (*Id*. at pp. 918-919.)

The appellate court found there was insufficient evidence to support Marron's and Vallejo's convictions as aiders and abettors, emphasizing there was no evidence of weapons used during the fistfight and that the shooting occurred after the fistfight had ended. (*Medina*, *supra*, 46 Cal.4th at p. 922.) The *Medina* court reversed. It determined Medina's firing of the gun was a reasonable and foreseeable consequence of the fistfight. (*Id*. at p. 920.) It held, "*prior knowledge that a fellow gang member is armed is not*

29

*necessary to support a defendant's murder conviction as an aider and abettor*," particularly given the great potential for escalating violence during gang confrontations. (*Id*. at p. 921, italics added.) "*[I]n the gang context*," the court concluded, "*it was not necessary for there to have been a prior discussion of or agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed*." (*Id*. at p. 924, italics added.) Also, a prior gang rivalry was not necessary to uphold the convictions (*id*. at p. 921), nor was evidence of a prior relationship between defendants and their victim. (*Id*. at p. 925.) The defendants' fleeing the scene before the police arrived was a further indication of their aiding and abetting. (*Id*. at p. 924.) The court emphasized that "the ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case." (*Id*. at p. 927.)

Here, reviewing the record as a whole and in the light most favorable to the judgment, we conclude the jury's verdicts were supported by substantial evidence. Cregan's testimony established that, when Boonoi was killed, defendants and Herrera were active participants in the Norteño criminal street gang who adhered to a Norteño code of conduct. That code required them to come to the aid of gang participants who were disrespected, and to respond to any altercation with greater violence than any initiated, including deadly force, or face negative consequences.

A reasonable juror could conclude from the circumstantial evidence that defendants Chavez and Sciutto came to Semeye's birthday party prepared to respond together as active gang participants to any altercation they or their fellow gang participants encountered. They arrived together with fellow gang participants, armed with knives. During the fight that ensued and as the group went to Morell's car, Norteño gang challenges were shouted. Neighbor Orellana heard a man in a white T-shirt near the car, which Wilson recalled Chavez wore that night (while others testified that Herrera wore a gray Giants jacket and Sciutto, a black Saints football jersey), yell the word "shaoo," which Cregan identified as a Norteño war cry or cry for help. A reasonable juror could conclude this challenge came from defendants' group in light of their active

30

Norteño gang participation and Cregan's conclusion that none of the other party attendees were affiliated with gangs.

The circumstances also suggest a gang-related reason for Chavez's and Sciutto's armed assaults. Phipps's testimony indicated that Mike met Herrera at the front door of his sister's house with immediate hostility, telling Herrera he had to leave. Multiple witnesses indicated Mike subsequently punched or hit Herrera. Cregan indicated that such disrespectful and aggressive actions towards a gang participant called for that person and other gang participants to retaliate with greater aggression. The same rationale applied when Wilson grabbed and started punching Sciutto.

Although no one saw Boonoi fighting or who stabbed him, the evidence indicated he was in the vicinity when Chavez stabbed Mike and Sciutto stabbed Wilson. Semeye recalled that around the time she saw Mike and Herrera arguing, Boonoi came outside and stood near the wall that separated the front yard of Nou's residence and the sidewalk, thereby indicating Boonoi was in the immediate area of the fighting when it began. Aguilar saw Boonoi, in a garden area out front holding himself, look at his hand, and collapse as Wilson was scuffling with someone on the street in front of Nou's house. Mike testified that he, Mike, was stabbed in the street as well. Also, Mike's testimony that Boonoi, as "the oldest," liked to be in charge of his relatives, suggested he would come to the aid of his cousins Mike and Wilson, and Boonoi was stabbed repeatedly in his torso, as opposed to his extremities, just as were Mike and Wilson, further suggesting he was stabbed by Chavez or Sciutto. Finally, there was substantial, direct evidence that Chavez stabbed Mike and Sciutto stabbed Wilson during the fighting and, conversely, no evidence that anyone else was armed.

A reasonable juror could also conclude Chavez and Sciutto were aware of, and encouraged by, each other's armed assaults against unarmed partygoers. They committed these acts in close proximity to each other in the same period of time. Witness testimony indicated that during this time, people referred to stabbings and victims showed signs of copious bleeding and injury. Aguilar saw Nou run back inside the house with blood all over her hand, and saw Boonoi, in the front garden area holding himself, look at his hand,

31

and collapse around the time that Wilson was in a scuffle in the street. Aguilar also recalled pulling Wilson away, and lifting his shirt, at which point blood gushed out. Mike indicated, whether at trial or to investigating police, that he was stabbed twice, including, once in the side by Chavez, that people shouted out to him that he had been stabbed, and that he saw Chavez drop a knife blade in the street and pick it up before leaving. Nava saw blood "gushing out" of Mike when she pulled him away from a man, who then ran to Morell's car. After defendants left, Nou saw Boonoi walking, drenched in blood.

Finally, there was substantial evidence that Chavez and Sciutto fled together in a car driven by Morell, another active gang participant. Neighbor Orellana said the group left after one of the girls urged that they leave the area before the police arrived, further demonstrating that they acted together.

Chavez and Sciutto emphasize the evidence that supports their point of view, while disregarding the most important substantial evidence against them. Chavez points to such matters as the lack of evidence that he was injured during the fighting, that no weapons were recovered from his home, and that no trace evidence connected him to Boonoi's stabbing. However, he neglects to acknowledge the substantial evidence that he stabbed the unarmed Mike, did so in coordination with Sciutto as active gang participants acting in accordance with their Norteño code of conduct, was in the vicinity of Boonoi during the fighting, was seen by Mike to drop a knife on the ground as he departed, and shouted "shaoo" as he fled with the other gang participants before the police arrived. His failure to do so is fatal to all of his arguments, which we need not further discuss.

Similarly, Sciutto largely ignores the substantial evidence that he repeatedly stabbed the unarmed Wilson and then fought with Mike, both within the vicinity of Boonoi, did so in coordination with Chavez as active gang participants acting in accordance with their Norteño code of conduct, left together with other gang participants before the police arrived as gang challenges were shouted from the group, and was bleeding as he left, including on a knife clip found on the floorboard of Morell's car. Sciutto makes the remarkably incomplete assertion, for example, that "[h]is only conduct

32

prior to Boonoi's stabbing consisted of his cordial interaction with Nou and Phanchanh and his being assaulted by Wilson." He also argues that, assuming he did stab Wilson, he showed "patience" and engaged in only a "graduated response" to Wilson's punches. This is utterly unpersuasive; Sciutto does nothing to establish that Wilson did anything that merited repeated, potentially fatal knife stabs to his back. Sciutto's argument that he fought with Mike only because Mike "was swinging at anyone who came near him" is not supported by the record. In light of Sciutto's failure to take into account the most significant substantial evidence of his guilt, we need not further discuss his arguments either.

Therefore, we conclude, viewing the evidence as a whole in a light most favorable to the judgment, that there was substantial evidence such that a reasonable juror could conclude beyond a reasonable doubt that either Chavez or Sciutto fatally stabbed Boonoi. Such a juror could conclude Boonoi's stabbing was a natural and probable consequence of a common plan or design of a conspiracy in which Chavez and Sciutto participated to respond with greater violence, including assault with a deadly weapon, i.e., knives, in accordance with the Norteño code of conduct to any altercation that occurred when they went together to the birthday party. Such a juror could also conclude Boonoi's stabbing was a natural and probable consequence of Chavez's and Sciutto's assaults with deadly weapons at the party, and that each aided and abetted the other in these assaults by their actions.

## C. *Cregan's Testimony About the Norteño Criminal Street Gang*

Sciutto asserts there was insufficient evidence, i.e., Cregan's testimony, to satisfy the definition of a "criminal street gang" in the sentence enhancement statute, section 186.22, subdivision (f), because Cregan did not testify about the Norteños' "primary activities." Therefore, there was insufficient evidence to support the prosecutor's uncharged conspiracy theory of liability. This argument lacks merit for three reasons.

First, Sciutto's argument is superfluous because Sciutto's and Chavez's criminal liability was also established under aider and abettor theory, as we have discussed.

33

Second, Sciutto's argument is logically flawed. Whether Cregan established a "primary activity" of the Norteños may have been relevant to defendants' sentence enhancements, but not the prosecutor's uncharged conspiracy theory. That theory, as we have discussed, was based on Cregan's testimony about the Norteño code of conduct, Sciutto's and Chavez's adherence to this code of conduct as active Norteño gang participants, and their conduct on the night of the incident. Whether or not a statutorily defined "primary activity" of a "criminal street gang" was established does not reduce the substantial nature of this evidence.

Third, Cregan's testimony *did* establish the existence of the Norteños as a "criminal street gang" pursuant to section 186.22, subdivision (f). A "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e),* having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added; see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 [proving one of the enumerated acts is a primary activity is sufficient to establish the existence of a "criminal street gang"].) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony . . . ." (*Sengpadychith*, at p. 324.)

Cregan testified about the Norteño gang's patterns of criminal activity, and in doing so referred to the crimes enumerated in section 186.22, subdivision (e), the subdivision also relevant to the determination of "primary activities." He testified that "assault with a deadly weapon," was "a crime that is very, very prevalent among gang members, particularly among Norteños" and "a very, very common occurrence in Sonoma County and throughout the state." He identified numerous other crimes, including robbery, murder, shooting at an inhabited dwelling with a firearm, shooting

34

from a vehicle, witness intimidation, kidnapping, mayhem, criminal threats, prohibited possession of a firearm, and carrying concealed firearms as "common" occurrences. Cregan's list of "common" crimes committed by the Norteño gang matched many of the criminal acts enumerated in section 186.22, subdivision (e).  (§ 186.22, subds. (f) and (e)(1), (2), (3), (5), (6), (8), (16), (24).)

We conclude Cregan's testimony was sufficient for two reasons.  First, in our own review of the record, we have found that Cregan clearly indicated in cross-examination that criminal acts enumerated in his PowerPoint presentation regarding Norteño patterns of criminal activity were "primary activities" of the Norteños.  The context of his comments indicates these included the enumerated criminal acts we have indicated he said were "common."[9]

Second, even without such comments, Cregan's reference to "common" crimes by Norteño gang members was sufficient to establish the gang's "primary activities." Sciutto argues it was not because "common" is "a vague and subjective adjective that does not provide evidence that NX4 or the Norteños exist for a criminal purpose."  We disagree.  As Sciutto acknowledges, an expert need not expressly refer to "primary activities" to meet the statutory requirements.  (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107 [omission of the word "primary" from an expert's answer to a question about "primary activities" was not fatal to the testimony].)  The expert need only establish that gang members "*consistently and repeatedly*" have committed crimes enumerated in the gang statute.  (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) Based on our independent research, we conclude Cregan's testimony that the Norteños commonly committed numerous crimes, along with his testimony that three active Norteño gang participants were each convicted of assault with a deadly weapon, was sufficient to meet the "primary activity" element.  (See *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 [testimony of criminal activities engaged in " 'often' " by gang

_____

[9] The People argue Cregan *did* refer to enumerated crimes as "primary activities" on cross-examination, in a passage that Sciutto contends has been misconstrued by the People.  We need not resolve this debate in light of our conclusion here.

35

members, including "often enough" to control an area's narcotics trade, and evidence of a robbery and conviction by gang members, was sufficient to establish the requisite "primary activity"].)

Sciutto also argues that Cregan's testimony was insufficient because it lacked foundation, since Cregan did not identify the basis for his testimony, citing *In re Alexander L.* (2007) 149 Cal.App.4th 605. There, an expert testified that he "knew" a gang was involved in certain crimes, without elaboration. (*Id.* at p. 611.) The court concluded that was not substantial evidence because it could not tell if the expert's claimed knowledge was "based on highly reliable sources, such as court records of convictions, or on entirely unreliable hearsay." (*Id.* at p. 612.)

The People do not respond to this particular argument. Nonetheless, we conclude *In re Alexander* is inapposite because Cregan *did* state the source of his information. Specifically, he said he considered Norteños and NX4 to be criminal street gangs from his investigation of hundreds of cases involving Norteño criminal street gangs. "It is an ongoing organization," Cregan testified, "that every single day, even here specifically in the city of Santa Rosa, I deal with reports of crimes that are committed by the Norteño criminal street gang." Sciutto's argument is unpersuasive in light of this testimony. (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1465 ["testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities"].)

## D. *Gang Evidence Regarding Sciutto*

Sciutto similarly argues there was insufficient evidence to support his conviction for active gang participation and the finding that the gang sentence enhancements were true. Again, we disagree.

Sciutto primarily contends Cregan's testimony did not establish the Norteños were a criminal street gang. As we have discussed, this is not correct. He also contends there was no substantial evidence that he "willfully promot[ed], further[ed] or assist[ed] in any

36

felonious criminal conduct by members" of the Norteño criminal street gang, as required for his active gang participant conviction. (§ 186.22, subd. (a).) As we have discussed above, there was substantial evidence of such conduct. Thus, Sciutto was subject to the active gang participation and gang sentence enhancement provisions of section 186.22.

**E.** *Morell's Insufficient Evidence Claims*

Morell argues her convictions must be reversed because there was insufficient evidence that she helped Chavez and Sciutto knowing they had committed *felony* assault with a deadly weapon, with its attendant gang enhancement, or that she was an active participant in a criminal street gang who knowingly promoted, furthered, and assisted in *felony* criminal conduct by gang members. This is incorrect.

There is no dispute that Morell drove Chavez, Sciutto, Herrera, and others away from the scene of the incident in her car. Morell contends that "[t]he single factual issue involved regarding [her] being an accessory after the fact is whether [she] was aware when she drove away from the scene that any of the three assault victims . . . had injuries consistent with a knife attack." She contends there is no such evidence.

"Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (§ 32.) As Morell points out, a person is guilty of being an accessory after the fact only if he or she has " '[k]nowledge that the principal committed a felony or has been charged with the commission of one . . . .' " (*People v. Moomey* (2011) 194 Cal.App.4th 850, 858.) "In determining whether the alleged accessory had such knowledge, 'the jury may consider such factors as his possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense.' " (*Ibid.*)

We conclude a reasonable juror could find beyond a reasonable doubt that Morell was guilty as an accessory after the fact based on the circumstantial evidence. Semeye's and Nou's testimony indicated Morell was in the midst of the fighting from beginning to

end.  As we discussed in reviewing the substantial evidence of voluntary manslaughter, witness testimony indicated that during the fighting, people referred to stabbings and victims showed signs of copious bleeding and injury.  There was substantial evidence that Nou was seen with blood all over her hand, Boonoi was seen drenched in blood as he collapsed, shouts that Mike had been stabbed were heard, Wilson and Mike were seen with blood gushing out of them, and Chavez was seen dropping a knife on the ground before he ran to the car.  Also, a knife clip with Sciutto's blood on it was found inside Morell's car, as were knives that apparently were not used in the incident.  Cregan testified that Chavez and Sciutto coming to Herrera's side and fighting, including with weapons such as knives, was consistent with the Norteño code of conduct, and that females in the Norteño criminal street gang played an important role of aiding active gang participants after they commit crimes.  A reasonable juror could conclude beyond a reasonable doubt from this evidence that Morell was aware that Chavez and/or Sciutto stabbed people during the fight.

A reasonable juror could also conclude beyond a reasonable doubt that Morell was subject to both the active gang participant and gang sentence enhancement provisions of section 186.22 because she knew of, and assisted, in the gang-related aspects of the incident.  There was ample evidence of Morell's active gang participation and knowledge that the incident was gang-related.  Cregan testified that Morell was an active participant in the Norteño criminal street gang and lived with her boyfriend, Chavez, in a residence containing gang-related material; gang-related photographs on Morell's Myspace web site were posted before, but removed shortly after, the incident; Chavez, Sciutto, and Herrera were active Norteño gang participants; photographic evidence showed Morell associating with Herrera and other Norteño gang participants in 2008.  We have already discussed the circumstantial evidence of the deadly violence employed by Sciutto and Chavez, some portion of which a juror could reasonably conclude Morell witnessed.  A juror could also reasonably conclude Morell at least heard certain Norteño gang challenges, including "Norte," said during the fighting, and "Norte 14" and "shaoo," shouted from the departing group.

Morell rightly points out that there was no evidence that she participated in the fight itself, and that in fact she attempted, with Semeye, to stop the fight, thereby indicating that she was "actually undermining gang activity." These contentions do not affect our analysis because of the evidence of Morell's conduct *after* the fight, from which a reasonable juror could conclude that she helped Chavez and Sciutto flee the area with knowledge of their felony conduct before police arrived.

### III. *Chavez's "Inconsistency" Claim*

Chavez argues the jury's finding him guilty of voluntary manslaughter based on sudden quarrel or heat of passion necessarily means, as a matter of law, that the accompanying gang sentence enhancement could not be true. A person who is provoked to commit manslaughter, he argues, must have lacked the "rational, considered state of mind" necessary to form the requisite specific intent. Therefore, he asserts, this sentence enhancement must be reversed. We disagree.

In support of his argument, Chavez cites to *People v. Aranda* (2012) 55 Cal.4th 342. However, that case does not help him. Aranda, after engaging in a large backyard brawl at a party, argued with the victim and fatally shot him when, according to Aranda, the victim rushed at him waving a rock. (*Id.* at p. 351.) The court, in discussing instructional error inapposite to the issues before us, emphasized that the prosecution, while arguing to the jury that defendant had committed murder with the specific intent to further, promote, or assist in criminal conduct by gang members, also told the jury this gang enhancement would not apply if the jury found defendant guilty of voluntary manslaughter instead. (*Id.* at p. 371.) While that may have been true in that case, the *Aranda* analysis is not relevant to the issue before us.

Chavez's theory lacks merit for a simple reason: the jury could have concluded that Boonoi's *killing*, while not originally intended, occurred in the course of gang-related stabbing assaults by Chavez and Sciutto, for which there was evidence of the specific intent required by the relevant provision of the gang statute, section 186.22, subdivision (a), and was the natural and probable consequence of these assaults. (See. e.g., *Medina*, *supra*, 46 Cal.4th at p. 920.)

39

#### **IV.** *The Trial Court's Denial of Chavez's Motion to Bifurcate*

Chavez argues the trial court's denial of his motion to bifurcate the gang charges unfairly prejudiced his defense, denied him a fair trial, and was tantamount to the prejudicial joinder of counts. We disagree.

#### **A.** *Chavez's Bifurcation Motion Arguments*

Prior to trial, Chavez moved to bifurcate the gang enhancement allegations and active gang participation count from the other charges against him, arguing, among other things, that the gang evidence was extremely prejudicial and not relevant to the murder and assault charge. The trial court, after reviewing some of the gang evidence and noting its relevance to the People's overall case, concluded, "The People have a right to prove their case up front. And then you look at—two almost identical trials in the beginning and end, it would be an absolute waste of the court's time, because to prove the base charge the People . . . really need the gang evidence, [e]specially to explain how it happened. If you bifurcated the trial, two trials nearly identical, except you'd be artificially eliminating evidence that the People should be entitled to bring to prove their case if they can." It denied the motion.

We review a trial court's denial of a motion to bifurcate for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)

Chavez makes four arguments. First, he emphasizes our Supreme Court's conclusion in *People v. Calderon* (1994) 9 Cal.4th 69 that "the risk of undue prejudice posed by the admission of evidence of a prior conviction, considered against the minimal inconvenience generally caused by bifurcating the trial, frequently will militate in favor of granting a defendant's timely request for bifurcation." (*Id.* at p. 79.) This has no bearing here because, as Chavez's discussion also suggests, the court subsequently held that "[a] gang enhancement is different from the prior conviction at issue in *Calderon.* A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So

40

less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.)

Second, Chavez argues we should reach the same conclusion as the appellate court in *Albarran*, *supra*, 149 Cal.App.4th 214, and hold that the trial court improperly allowed the gang evidence to be presented at the trial of the murder and assault counts. *Albarran* does not avail him, however, because it involves inapposite facts. Albarran and another male fired multiple shots at a home during a party and committed a carjacking in order to escape. (*Albarran*, at pp. 217-218.) No gang names or signs were displayed during the incident, nor were there any other indicia of gang involvement specific to the event. Albarran was charged with numerous counts, including attempted murder, which were accompanied by gang enhancement allegations. (*Id*. at p. 219.) Despite the lack of any event-specific gang evidence, the trial court denied a pretrial motion to exclude the gang evidence, made pursuant to Evidence Code section 352. (*Id*. at p. 225.) It allowed in evidence of Albarran's gang activities and expert testimony about gang conduct, including the expert opinion that the shooting was gang-related and intended to benefit a criminal street gang. (*Id*. at pp. 219-221.) The jury convicted Albarran of a number of counts, including attempted murder. The court then granted Albarran's motion for a new trial as to the gang enhancements, but denied it as to the underlying charges. (*Id*. at p. 222.) The *Albarran* court vacated Albarran's convictions and ordered a new trial because the gang evidence should not have been admitted at trial, since "there [was] nothing inherent in the facts of the shooting to suggest any specific gang motive." (*Id*. at p. 227.)

Generally, "[u]nder Evidence Code section 352 the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] . . . [I]ts exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Evidence is substantially more prejudicial than probative "if, broadly

41

stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

Also, "as [a] general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. [Citation.] Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. [Citations.] . . . Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury." (*Albarran*, *supra*, 149 Cal.App.4th at pp. 223-224.)

Given the broad discretion provided by Evidence Code section 352, *Albarran* is easily distinguishable from the present case. The gang evidence introduced via Cregan was very probative of the murder, assault, and gang charges brought against Sciutto and Chavez under the prosecution's theories of liability. The evidence went directly to defendants' motives and intent, central issues at trial. The evidence of their status as active gang participants in NX4, the Norteño code of conduct, and the gang challenges used by active gang participants provided important context for defendants' conduct on the night of the incident, as we have discussed. Therefore, the reasoning of *Albarran* does not apply here.

Third, Chavez argues Cregan's testimony was improper because Cregan relied on his "training and experience" alone and had only a law enforcement background. Cregan "in reality testified as a summary witness offering up an opinion that did nothing more than inform the jury how he believed the case should be decided," and "amounted to nothing more than character assassination." There is no merit in these contentions. Cregan was found by the court to be an expert. His testimony was consistent with the parameters for such testimony and very probative of the motive and intent of defendants Chavez and Sciutto, as we have discussed.

42

Finally, Chavez argues that "it [was] not relevant that all the defendants, including Chavez, had been arrested before, and had in the past been stopped by the police in the company of others who law enforcement believe belong[ed] to the Norteño criminal street gang. Similarly, the history and activities of the Norteño criminal street gang was not probative on the issue of whether Chavez was involved in the assaults which gave rise to the voluntary manslaughter and assault verdicts." Putting aside that Chavez does not cite to a relevancy objection made below, this evidence of gang participation was admissible under the particular circumstances of this case, as our discussion has already indicated.

**B. *Chavez's "Improper Joinder" Argument***

Chavez also argues that the introduction of gang evidence was tantamount to the prejudicial joinder of counts because of the irrelevance and prejudice of the gang evidence, thereby denying Chavez a fair trial. He bases his argument on the four criteria established by our Supreme Court for the evaluation of a claim of prejudice from the denial of a severance motion in *Williams v. Superior Court* (1984) 36 Cal.3d 441. We reject this argument as well.

Chavez did not move for severance, and "[t]he analogy between bifurcation and severance is not perfect." (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) Regardless, *People v. Williams, supra,* 36 Cal.3d 441 discussed four principal criteria for evaluating a claim of prejudice from denial of a severance motion. We need not discuss all four. As our Supreme Court later stated, "[i]f the evidence would have been cross-admissible, then joinder of the charges was not prejudicial." (*People v. Thomas* (2012) 53 Cal.4th 771, 798.) The gang evidence was highly probative regarding the murder and assault charges against Chavez and Sciutto and, therefore, cross-admissible. Chavez's argument lacks merit.

### V. *Other Evidence Code Section 352 Issues*

Sciutto and Morell also invoke Evidence Code section 352 to argue certain evidence should not have been admitted at trial. As we have discussed, Evidence Code section 352 provides that the trial court "in its discretion may exclude evidence if its

probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Thus, we review a court's decision for abuse of discretion. (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1124.)

## A. *Sciutto's 2002 Possession of a Weapon*

Sciutto argues that the trial court committed prejudicial error by denying his motion to exclude evidence that a police officer in March 2002, investigating a large fight among juveniles, discovered Sciutto was armed with a weapon. We disagree.

### 1. *The Relevant Proceedings Below*

Prior to trial, Sciutto moved in limine to exclude evidence of the March 2002 incident, in which a Rohnert Park police officer sent to the scene of a reported fight of up to 30 juveniles saw Sciutto, a juvenile at the time, with a baseball bat. The officer, as he took the bat from Sciutto, heard something drop to the ground and saw two kitchen knives on the ground nearby. Sciutto was searched and a kitchen knife was found in his pocket, leading to his arrest. Sciutto asserted in his motion that, even if relevant to the gang count and gang enhancements alleged against him, "the inflammatory nature" of the evidence outweighed its probative value. He moved that it be excluded or, at the least, "redacted" to exclude possession of a knife or other weapons.

At the hearing on Sciutto's motion, the prosecutor contended that Cregan would testify that this incident was relevant to show Sciutto's "association with Norteños and that he was involved in a fight" in which weapons were involved. Defense counsel objected that past use of a knife was inappropriate evidence pursuant to Evidence Code section 1101, subdivision (b); in response, the prosecutor proposed the type of weapon not be identified. The court ruled that specific mention of a bat or knife would be more prejudicial than probative, but, pursuant to Evidence Code section 352, it allowed testimony that the officer "was responding to a large fight and that the named parties in that incident were armed with weapons."

Cregan testified, "[There] was an incident [in March 2002] where a Rohnert Park officer contacted Sciutto in the company of two Norteño gang participants. . . . They are both known members of the NX4 Norteño criminal street gang subset. [¶] In this incident it was significant that all three . . . were armed with some type of weapon and that they were . . . active Norteño gang participants together."

### 2. *Analysis*

Sciutto argues the 2002 evidence was not relevant to whether or not he was an active Norteño gang participant because the conduct required to be shown related only to his knowing association with Norteños or his knowledge that Norteños committed felonies, pursuant to the requirements stated in section 186.22, subdivisions (a) and (f) respectively. According to Sciutto, mere weapon possession offenses were not necessarily felonies, and "evidence that [Sciutto] was armed on a prior occasion, even in the company of another Norteño, was irrelevant for Cregan's opinion. It does not show knowledge of statutorily defined gang activity." It also was prejudicial because it was the only evidence the jury heard connecting Sciutto with a weapon and, since no witness saw anyone with a weapon, this prior conduct "gave the jury a powerful, if improper[,] basis for concluding [Sciutto] perpetrated the stabbings here, or at least conspired to commit them."

Sciutto's argument is unpersuasive for three reasons. First, that Sciutto was found by a police officer at the scene of a possibly large fight in the company of known NX4 members, armed with a weapon, was directly relevant to establishing that Sciutto had engaged in gang activity with these known members, rather than merely being in their company, and was adhering to the Norteño code of conduct that Cregan described. The trial court "sanitized" the episode so as to not cause undue prejudice by limiting the evidence to a reference to a "weapon." Sciutto fails to explain how this was unduly prejudicial in light of the very probative nature of this evidence, given the gang-related charges against him and the People's theories of liability.

Second, there was strong evidence that Sciutto stabbed Wilson, based on Wilson's and Aguilar's testimony, undermining Sciutto's argument of undue prejudice.

45

Third, the trial court also instructed the jury pursuant to CALCRIM No. 1403 to consider evidence of gang activity for the limited purpose of deciding whether "defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancement charged," and not to consider the evidence for any other purpose, including that defendant was a person of bad character or had a disposition to commit the crime charged. Such an instruction "minimized any danger that the jury might rely upon" this evidence for an improper purpose. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1119 [regarding court's instruction that evidence of past violence was admitted for the limited purpose of showing motive].) "[T]he jury is presumed to have followed the instructions and obeyed the law." (*People v. Ryan* (1981) 116 Cal.App.3d 168, 179.)

Therefore, we conclude the trial court did not abuse its discretion, and do not address the parties' debate over whether any error was prejudicial.

**B.  *Cregan's Testimony About Javier Zubiate***

Morell also argues the court prejudicially erred in allowing Cregan to testify about Javier Zubiate, who Cregan identified as controlling Norteño gang activities in Northern California from Pelican Bay Prison, because the testimony was irrelevant, inflammatory, and highly prejudicial. We disagree.

Morell's trial counsel objected to questions about Zubiate, which the court overruled. Cregan gave his testimony regarding Zubiate as part of his description of the structure and history of the Norteño gang, and his opinion that the Norteños were a criminal street gang with a "formal level chain of command" that extended to subsets in Sonoma County, including NX4. Cregan said female gang participants helped "people like Javier Zubiate" "sen[d] back orders to the streets of Santa Rosa." However, "street level foot soldiers," of which Morell was one, did not have communication with Zubiate.

Morell argues Cregan's testimony about Zubiate was unduly prejudicial, particularly his testimony about Zubiate's communication of his wishes to "foot soldiers" in Santa Rosa, because, although it was not relevant to her knowledge about the stabbings, it could have persuaded jurors that Morell knew what happened. This

46

argument ignores the obvious relevance of Cregan's testimony about Zubiate. Cregan described the history and structure of the Norteño gang as part of his testimony that it, including its NX4 subset, was a criminal street gang. This was an important part of the People's case, including because of the criminal street gang enhancement allegations and active criminal street gang participant counts against all the defendants.

Connecting the larger Norteño gang to its NX4 subset was also relevant, given the evidence that Morell had posted an image on her Myspace web site referring to "NX4," and Chavez and Sciutto had identified with the NX4 subset. Also, we do not see any undue prejudice in light of the brevity of this portion of Cregan's testimony and the absence of any statements connecting Zubiate directly to Morell. In short, Morell fails to establish that the trial court abused its discretion in admitting the Zubiate evidence.

## VI. *Chavez's Constitutional Challenge to Section 186.22*

Chavez also argues that his conviction for active participation in a criminal street gang pursuant to section 186.22 violates his state and federal constitutional rights to due process.[10] He argues that the due process provisions of article I, section 7 of the California Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution, require that the state "give its citizenry fair notice of potentially criminal conduct." Chavez argues, based primarily on federal case law, that section 186.22 is unconstitutionally vague and overbroad, and "unconstitutionally criminalizes Chavez's status as a purported Norteño criminal street gang member even though there is no evidence that Chavez committed the crime for the benefit of the gang or in furtherance of the gang's activity."

As we have discussed, Chavez's argument that there is no evidence of his commission of a gang-related crime is incorrect. As for the remainder of his argument, our Supreme Court rejected very similar due process arguments regarding section 186.22

---

[10] Chavez also argues section 186.22 violates his federal equal protection rights. However, other than an unexplained citation to *People v. Beeman* (1984) 35 Cal.3d 547, 555, which does nothing for his cause, he provides no legal authority for this proposition. Therefore, we disregard it. (*Stanley*, *supra*, 10 Cal.4th at p. 793.)

in *People v. Castenada* (2000) 23 Cal.4th 743. The court rejected the contention that the statute was too vague to provide fair warning, encouraged arbitrary law enforcement, and punished gang members for their status alone. (*Id.* at p. 752.) We follow *Castenada* and reject Chavez's challenge.

### VII. *Sciutto's Claims Regarding CALCRIM Nos. 3471 and 3472*

Sciutto argues the trial court committed prejudicial error by instructing the jury pursuant to CALCRIM No. 3471, regarding mutual combat and initial aggressor, and CALCRIM No. 3472, regarding contrived self-defenses, in addition to instructing as Sciutto requested on self-defense.[11] He argues there was not substantial evidence to justify giving these extra instructions, which prejudicially interfered with his ability to argue that he acted in self-defense. We conclude that, assuming for the sake of argument that error occurred, it was harmless under both the federal and state standards.

Our Supreme Court has instructed, "[A]ny right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.] The right of self-defense [does] not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack." (*People v. Pinholster* (1992) 1 Cal.4th 865, 966.) This is because "[t]he principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules . . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the

---

[11] The court instructed the jury pursuant to CALCRIM No. 3471: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; AND [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight." It instructed the jury pursuant to CALCRIM No. 3472: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."

privilege of retaliating with deadly force.' [Citations.] Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack." (*People v. Clark* (1982) 130 Cal.App.3d 371, 380.)

We agree with the People that the jury would not have found self-defense under any circumstances because Sciutto and Chavez employed deadly force by using knives to stab their victims in their torsos in response to punches by unarmed partygoers. Therefore, any error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), the standard defendant argues applies here, and it is not reasonably probable that the outcome would have been different in the absence of any error (*People v. Watson* (1956) 46 Cal.2d 818), the standard the People contend applies.

### VIII. *Stay of Sciutto's Active Gang Participant Sentence*

Sciutto argues his sentence must be modified because the trial court abused its discretion when it denied his section 654 motion for a stay of his term for active participation in a criminal street gang and, instead, imposed a two-year concurrent term. The People agree that this sentence should have been stayed. We conclude this is correct.

Section 654 provides that a defendant may be punished only once for "[a]n act or omission that is punishable in different ways by different provisions of law . . . ." (§ 654, subd. (a).) Sciutto argues the trial court should have stayed his active gang participant sentence pursuant to *People v. Mesa* (2012) 54 Cal.4th 191. In *Mesa*, our Supreme Court held that, pursuant to section 654, the trial court had erred when it imposed two additional sentences for active gang participation (§ 186.22, subdivision (a)) because they were based on the same acts as those supporting defendant's convictions for assault with a firearm and possession of a firearm by a felon. (*Mesa*, at pp. 200-201.) We agree with Sciutto that the trial court committed the same error here by imposing sentences for assault with a deadly weapon and voluntary manslaughter based on the same actions

49

upon which Sciutto's active gang participant conviction was based. Therefore, it should have stayed sentencing regarding the latter conviction.[12]

In light of our conclusions, we do not address Chavez's and Sciutto's arguments of cumulative prejudicial error.

**DISPOSITION**

Sciutto's two-year term for active gang participation is stayed pursuant to section 654 and, as modified, the judgment is affirmed. The trial court is ordered to prepare an amended abstract of judgment with this modification and forward a certified copy to the Department of Corrections and Rehabilitation.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_____

[12] Chavez also received a concurrent sentence for active gang participation. He does not join in this appellate claim by Sciutto and the People do not address Chavez's concurrent sentence. Therefore, we make no determination regarding it.